UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

        Case No.: 21-20427
        Honorable Gershwin A. Drain

PHILLIP GRANGER,

        Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTIONS TO SUPPRESS [#40, #41], FINDING THE ENDS OF JUSTICE WILL BE SERVED BY GRANTING A CONTINUANCE AND EXCLUDING CERTAIN DATES FROM THE SPEEDY TRIAL CLOCK AND AMENDING DATES**

**I.    INTRODUCTION**

Defendant Phillip Granger is charged in a four-count Indictment with conspiracy to possess with intent to distribute and to distribute controlled substances in violation of 21 U.S.C. § 846 (Count I); possession with intent to distribute and to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1) (Count III); and possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) (Count IV).

Now before the Court is the Defendant's Motion to Suppress Evidence and Defendant's Motion to Suppress Statements, both filed on May 20, 2022. *See* ECF

Nos. 40, 41. Defendant seeks to suppress evidence and statements resulting from what he claims was an unlawful search of his residence on Santa Rosa Street in Detroit, Michigan on July 7, 2016. Defendant argues the search was conducted in violation of the Fourth Amendment because the affidavit in support of the warrant application failed to provide probable cause to believe evidence of a crime would be found at his home. Defendant further asserts the information the officers relied on for probable cause was stale. Because the warrant affidavit lacked sufficient indicia of probable cause to justify reliance, the officers cannot rely on the good faith exception and the unlawfully seized evidence and statements must be suppressed as fruits of an unlawful search.

The Government filed responses in opposition to the Defendant's Motions to Suppress. *See* ECF Nos. 45, 48. The Government contends the warrant affidavit established probable cause to believe Co-Defendant Julian Watkins was involved in an ongoing drug conspiracy and that evidence and records sought would be found at the Santa Rosa residence, which was owned by Watkins. The Government further asserts that the warrant was not stale. Finally, the Government contends the exclusionary rule does not apply because the officers acted in good faith.

Defendant filed reply briefs in support of his present motions. *See* ECF Nos. 53, 54. The Court held a hearing on September 28, 2022. For the reasons that follow, the Court grants Defendant's Motions to Suppress.

## II. FACTUAL BACKGROUND

Beginning in March of 2016, the Detroit Field Division of the Drug Enforcement Administration (DEA) became involved in the investigation of Gary Lee Major[1] and his Drug Trafficking Organization (DTO). ECF No. 46, PageID.188, **filed under seal**. A confidential source identified Major as the leader of a cocaine distribution organization based in Detroit, Michigan. Through the investigation, DEA agents learned Watkins was a Detroit-based narcotics dealer who received large shipments of cocaine via a Mexican based source and supplied drugs to Major. Major distributed the drugs to street dealers on the west side of the city. *Id*.

During their investigation, agents observed the DTO members meet at Hangover's Lounge, a bar owned and operated by Watkins. *Id.*, PageID.201. They also intercepted phone calls between Watkins and an unidentified caller who Watkins met with outside of Hangovers Lounge for a suspected narcotics transaction, however officers' view was obstructed during the exchange. *Id.*,

---

[1] On March 31, 2022, the Government moved to dismiss the Indictment against Major due to his death on or about February 28, 2022. *See* ECF No. 38, PageID.121.

PageID.229. An additional intercepted phone call revealed Watkins requested that an unidentified caller scope out the parking lot of the Hangovers Lounge because Watkins was concerned about vehicles that he believed were suspicious. *Id*.

The DEA investigation also uncovered that Watkins operates a marijuana grow operation in a commercial warehouse on Ryan Road, in Hamtramck, Michigan. In the summer of 2015, an anonymous caller contacted the DEA and indicated the warehouse was being used as a marijuana grow operation and that narcotics are being stashed in the furnace of the location. On April 25, 2016, intercepted phone calls revealed Watkins informing a potential customer that he needed to go to the east side to obtain drugs. *Id*., PageID.219. On the same date, investigators later observed the garage door open to the warehouse and Watkins' cell phone pinged in the area of Ryan Road and the warehouse at 5:07 p.m. *Id*., PageID.220. Investigators have further observed Watkins go to the warehouse on Ryan Road on numerous occasions for brief periods of time. Utility records for this address are in the name of Jacob Jones, a Tennessee resident, known to be utilized as an alias for Watkins.

Additional evidence of the DTO activities revealed that on March 25, 2016, Watkins contacted the post office identifying himself as Wintson Thompson. Watkins was attempting to track the delivery of a package addressed to Thompson at an address located on Monica Street in Detroit, Michigan. *Id*., PageID.234.

4

Investigators attempted a controlled delivery of the parcel on March 28, 2016, however, Watkins pulled into a driveway about a mile from the Monica Street residence and drove away from the house and proceeded to contact Major. *Id.* Investigators believe Watkins was alerting Major and this is the reason the parcel was never delivered. *Id.* A later search of the parcel revealed it contained 546 grams of heroin. *Id.*

Watkins lives in Southfield, Michigan on Nottingham Street. *Id.*, PageID.188. He has a secondary residence in Detroit, Michigan on Pennington Street, where he has been observed dealing narcotics. *Id.,* PageID. 223-227. Property tax records indicate that the owner of the Pennington residence is Helen Watkins. *Id.* Additionally, on March 2, 2016, investigators observed Marvin Jenkins, another participant in the DTO, arrive at an address six homes away from the Pennington Street residence. *Id.* Investigators observed the rear passenger side door of Jenkins' vehicle open and Watkins standing near the open door of Jenkins' vehicle. *Id.* After a brief encounter, Watkins closed the door and Jenkins departed the area. *Id.*

Later that day, investigators observed Jenkins arrive at a hotel in Southfield, Michigan. *Id.* They observed Jenkins remove a large black duffle bag and enter the hotel. *Id.* Jenkins later left the hotel, and a Southfield police officer executed a traffic stop. *Id.* During a search of Jenkins' vehicle, officers located and seized

approximately 24 kilograms of cocaine. *Id.* A search of the hotel room uncovered $820,113.00 in United States currency, some of which was in the black wheeled duffle bag previously carried by Jenkins into the hotel after his meeting with Watkins at the Pennington Street address. *Id.*

In July of 2016, DEA Special Agent Brandon Kushel, who had recently joined the DEA in October of 2015, prepared a fifty-seven-page affidavit in support of his application to search nine locations purportedly connected to the DTO. *Id.*, PageID.191. Prior to his service with the DEA, Kushel worked as an Immigration Enforcement Agent and Deportation Officer for the Immigration and Customs Enforcement Administration (ICE) for seven years. *Id.* In his affidavit, Kushel sought a warrant to search six locations connected to Watkins–Hangover's Lounge, the Ryan Road warehouse, and the Nottingham, Pennington, Santa Rosa and Monica Street residences. *Id.,* PageID.188-189.

In the affidavit, Kushel explained the Santa Rosa address is owned by Watkins. *Id.*, PageID.129. He further indicated that open-source databases show that Granger is the current resident and surveillance has revealed a vehicle registered to Granger in the driveway of the Santa Rosa address. *Id.* The affidavit further describes a phone call intercepted on May 19, 2016 between Granger and Watkins. *Id.*, PageID.130.

At approximately 11:37 p.m., Granger called Watkins, who asked, "What's up with you?" and Granger replied, "shit, need you." Watkins then asked Granger, "what you got for me?" and Granger responded, "I got that thing." Watkins then stated, "look, and then, um, in your backyard . . . if you go straight in the back yard where you see the little, that dirt I, I poured onto the ground. Like you about to go in the gate to the alley." *Id*. Watkins further explained that "there's the ledges of bricks right there. You got to pull that, the, the little . . . it's a bag back there…just [U/I] you up another half . . . ." *Id*. The conversation continued and Granger told Watkins that, "the plants were still damp, damp as hell," which Kushel believed was "in reference to the conditions of the plants at" the Ryan Road grow warehouse. *Id.*, PageID.212. Watkins responded, "Oh, okay. That's cool. I just want you to check on them." *Id*. Investigators confirmed that Watkins was in Florida during the time of this conversation. *Id*. Kushel claimed that, "[b]ased on this telephone call, your affiant believes that this location may be utilized as a stash location by the" DTO. *Id*. The investigators also knew that the utility bills for the Ryan Road warehouse were being sent to the Santa Rosa house under the name of Jacob Jones. *Id.,* PageID.220.

Law enforcement officers executed the search warrant on the Santa Rosa residence on July 7, 2016. Defendant Granger was awoken by law enforcement forcing their way into the home, who immediately placed him in handcuffs.

During execution of the search, Granger was questioned by law enforcement as to "if there were any items of concern that officers conducting the search needed to be aware of." Granger made several incriminating statements. During the search of the Santa Rosa residence, agents found suspected narcotics, a firearm and paraphernalia.

### III. LAW & ANALYSIS

The Fourth Amendment provides that "no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To determine whether the police had probable cause to search, the court must determine whether the warrant comports with the Fourth Amendment. *United States v. McPherson*, 469 F.3d 518, 523 (6th Cir. 2006). Such a warrant requires "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010).

The issuing magistrate judge must have "a substantial basis for concluding that a search would uncover evidence of wrongdoing." *McPherson*, 469 F.3d at 523. The magistrate judge must evaluate the "totality of the circumstances set forth in the affidavit" and the magistrate judge's conclusion should not be set aside unless arbitrarily drawn. *Id.* An affidavit must present particularized facts demonstrating "a nexus between the place to be searched and the evidence sought."

*United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004). "The connection between the residence and the evidence of criminal activity must be specific and concrete, not vague or generalized. *Id*. (internal quotation marks omitted).

"Probable cause exists to search a residence if an affidavit 'directly connect[s] the residence with [] suspected drug dealing activity[.]" *United States v. Sheckles*, 996 F.3d 330, 341 (6th Cir. 2021). Such a connection has been found "when an anonymous tipster complained about drug sales at a home and officers later smelled drugs there." *Id*. Standing alone however, a defendant's status as a drug dealer does not give rise "to a fair probability that drugs will be found in his home." *Id*. In order to support probable cause, status as a drug dealer must be combined with some evidence that the dealer was engaged in "continual and ongoing operations typically involving large amounts of drugs." *Id.* (internal quotation mark omitted). Conversely, probable cause will not exist when the police have evidence that a known drug dealer engaged in "a single instance of drug possession or distribution" at the location. *Id*. Similarly, probable cause is absent if the police "lack[] independently corroborated evidence that the defendant was even a drug dealer (as opposed to a drug user)." *Id*.

In this case, the affidavit "failed to reference any criminal activity in relation to" the Santa Rosa residence and "lack[ed] any statement from [the affiant] as to why he believed that [the residence] could possibly be related to the alleged

9

crime." *United States v. Norwood*, 989 F. Supp. 2d 570, 575 (E.D. Mich. 2013). Indeed, the affidavit discusses one vague phone call between Granger and Watkins about a "bag" in the backyard. This is insufficient to establish probable cause that contraband, or evidence of drug activity, would be found inside the home. The affidavit provides no information that Granger, or anyone else, was seen entering or exiting the Santa Rosa address with drugs or engaging in drug transactions in close proximity to the home. There is no indication that a confidential informant engaged in, or knew of, drug transactions at the Santa Rosa address, or saw large quantities of drugs there. This is not a case where the magistrate judge could have drawn an inference that evidence of wrongdoing would be found in Granger's home, such as a case where there are independently corroborated facts that the defendant is a known drug dealer. *See United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006). Instead, Granger, and the Santa Rosa address, are only known to law enforcement because Granger was living in Watkins' home, and because of a vague phone call about a "bag" in the backyard.

Even if the phone call allowed the magistrate judge to conclude Granger and Watkins were discussing drugs, that information alone would not provide probable cause to believe drugs were inside the residence. The Government erroneously recites evidence establishing probable cause to believe Watkins is a drug dealer engaged in an ongoing drug trafficking scheme, however the Government cannot

solely rely on this evidence to establish evidence of criminal activity will be found at the Santa Rosa residence. There is no question that Agent Kushel's affidavit incudes facts that create a reasonable probability to believe that Watkins was engaged in drug dealing. But that alone does not establish probable cause to conclude evidence of drug trafficking would be found at the Santa Rosa residence. The problem with the government's position is that Watkins, the alleged drug trafficker, did not actually live at the Santa Rosa residence—Phillip Granger did. In contrast, where the drug dealer has only a connection to the residence, but does not live there, the Sixth Circuit has required sufficient evidence that "'directly connect[s] the residence with the suspected drug deal in activity[.]'" *United States v. Miller*, 850 Fed. Appx. 370, 373, (6th Cir. 2021) (quoting *United States v. Brown*, 828 F.3d 375, 381-85 (6th Cir. 2016)); *see Brown*, 828 F.3d 375, 384 (6th Cir. 2004) ("[I]f the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer."). The Sixth Circuit's decision in *United States v. Sheckles, supra,* in instructive. 996 F.3d at 342.

In *Sheckles*, the Sixth Circuit upheld the search of two residences associated with the defendant who was connected "to a large ongoing drug trafficking

operation" and had "been negotiating with [a known drug dealer] to buy 10 kilograms of cocaine." *Id*. In that case, during a DEA investigation of Mexican drug dealers, officers observed the *Sheckles* defendant at a suspected stash house with a rental truck. *Id*. at 335. A subsequent search of the house recovered a kilogram of heroin and $200,000 in United States currency. *Id*. The officers also intercepted phone calls between the known Mexican drug dealers and their source in Louisville, later determined to be the *Sheckles* defendant. *Id*. The "pinging" of the *Sheckles* defendant's phone led police to the Terrace Creek Apartments, where officers observed the defendant's Ford Expedition. *Id*. Officers later discovered through an informant that the drug deal between the *Sheckles* defendant and the Mexican dealers fell through because the defendant had invested in other drugs. *Id*. The officers pinged the *Sheckles* defendant's phone again, which took them to an apartment at the Crescent Centre Apartments. *Id*.

As to the Crescent Centre location, an employee informed officers that someone had just made an anonymous complaint about drug dealing from the apartment. *Id*. Officers smelled marijuana outside of the apartment, which was corroborated by the apartment employee who also smelled marijuana. *Id*. Police also observed the defendant's Expedition parked in a spot assigned to Apartment 234. The Sixth Circuit concluded this amounted to "substantial evidence"

connecting the *Sheckles* defendant's drug dealing with the Crescent Centre apartment. *Id*.

As to the Terrace Creek apartment, the Sixth Circuit acknowledged that search "present[ed] a much closer call." *Id*. at 341. However, there was evidence of the *Sheckles* defendant's ongoing drug trafficking, including that the defendant "had been negotiating with" the Mexican drug dealers "to buy 10 kilograms of cocaine[,]" but ended up "invest[ing] in other drugs." *Id*. The affidavit further described the evidence at "the Crescent Centre apartment, corroborating the ongoing nature of [the defendant's] drug distribution." *Id*. Finally, the officers believed the phone used by the *Sheckles* defendant to coordinate the drug deal with the Mexican dealers had pinged at the Terrace Creek location "days before the search." *Id*. The affidavit explained that the phone could have contained information about the *Sheckles* defendant's suppliers or buyers. *Id*. Based on the totality of these circumstances, the *Sheckles* court found the state court judge had a substantial basis to find probable cause to search the Terrace Creek apartment location.

Unlike the circumstances in *Sheckles*, there was no evidence that Granger was a drug dealer engaged in ongoing large-scale narcotics trafficking. Officers never observed any drug trafficking activity at the Santa Rosa address. Nor did they possess any corroborating evidence from a confidential source that drug

dealing ever occurred at that location. This case lacks any indicia that evidence of drug trafficking would be found at the Santa Rosa address, unlike the other residences that were subject to the search, which were either the home of a known drug trafficker engaged in ongoing drug dealing or involved known incidents of drug dealing (Pennington and Monica). The Government's argument that the officers were also searching for drug paraphernalia and records related to the DTO is not well taken. Because the affidavit failed to connect any ongoing drug dealing activity with the Santa Rosa residence, there likewise would be no probable cause to search the premises for other evidence of drug trafficking. "When police officers have probable cause to believe that a suspect is involved in drug distribution, there is also probable cause to believe that additional evidence of drug trafficking crimes (such as drug paraphernalia or sales records) will be found in her residence." *United States v. Sanchez*, 725 F.3d 1243, 1249 (10th Cir. 2013).

The search was also unconstitutional because it relied on stale information. A supporting affidavit may not rely on stale information, and in considering whether information is stale, the court considers several factors including '"the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), [and] the place to be searched (mere criminal forum of convenience or secure operational base?)."' *United States*

v. *Spikes*, 158 F.3d 913, 923 (6th Cir. 1998). Consideration of these factors indicate the supporting affidavit relied on stale information.

Here, law enforcement sought evidence of narcotics distribution at the Santa Rosa address based primarily on one phone call between Granger and Watkins on May 19, 2016. Law enforcement did not seek a search warrant until six weeks later, on July 6, 2016. In the context of drug crimes, "information goes stale very quickly 'because drugs are usually sold and consumed in a prompt fashion.'" *United States v. Brooks*, 594 F.3d at 493 (quoting *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009)). Again, there is no indication that Agent Kushel believed that ongoing criminal activity was occurring at the Santa Rosa address. There is no indication that a confidential informant engaged in, or knew of, drug transactions at the Santa Rosa address, or saw large quantities of drugs there. Instead, there is one vague phone call between Granger and Watkins about a "bag" in the backyard, which, even if this vague conversation did establish probable cause of drug activity at the Santa Rosa address, it lost its "freshness" by the time the search warrant was executed.

Lastly, contrary to the Government's assertion, the officers did not act in good faith and the exclusionary rule therefore applies. The Supreme Court held in *United States v. Leon*, 468 U.S. 897 (1984) that the exclusionary rule does not apply where an executing officer has reasonably relied on a warrant issued by a

neutral and detached magistrate." However, the Supreme Court emphasized that the good faith exception will not always allow for the admission of illegally seized evidence. *Id*. at 922 ("We do not suggest, however, that exclusion is always appropriate where an officer has obtained a warrant and abided by its terms."). In particular, the exception does not apply where a warrant "based on an affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. *United States v. Ronnie Buffer*, 529 F. App'x 482, 486 (6th Cir. 2013) (construing *Leon*). *See also United States v. Lester*, 184 F. App'x 486, 494 (6th Cir. 2006) (finding agents did not "investigate[] the house in a good faith search for evidence" indicating that the defendant was involved in an "ongoing involvement in a drug conspiracy or that his residence was being used in a drug conspiracy.").

The Government's reliance on *United States v. Malin*, 908 F.2d 163 (7th Cir. 1990) is misplaced. In *Malin*, the Seventh Circuit failed to resolve whether there was probable cause to search the home after officers received a tip from a neighbor that marijuana was growing in the backyard of the home and officers went to the home to confirm the marijuana was growing in the backyard. *Id.* Rather, the *Malin* court concluded that the facts presented a "doubtful case," that "should be resolved in favor of upholding the warrant" in light of the good faith exception. *Id*. In this case, there is no independent corroborating evidence that drug dealing was

16

associated with Granger's residence as in *Malin,* such as, independent officer corroboration that the drugs were present in the backyard or that drug dealing had been taking place at the residence. *Malin* does not help the Government's position.

The warrant for Santa Rosa did not offer sufficient information to conclude contraband would be found there. Unlike the warrants at issue in the authority relied upon by the Government, the warrant here does not state that Granger was known to sell drugs out of or store drugs in the Santa Rosa residence. Nor did Agent Kushel allege any information other than a cryptic phone call to support the conclusion that evidence of drug trafficking would be found at the Santa Rosa residence. The affidavit contained only questionable inferences and baseless conclusions. No reasonable officer could conclude these inferences upon inferences are enough to justify the search of Granger's home—the place where the Fourth Amendment's protections are strongest. *See Payton v. New York*, 445 U.S. 573, 585 (1980) ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (internal quotations omitted).

Finally, because the Court concludes the warrant was not supported by probable cause and the officers did not act in good faith, Defendant's motion to suppress statements provided during the execution of the unlawful search will also be granted. *See Segura v. United States*, 468 U.S. 796, 802 (1984) ("Evidence

obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion.").

## IV. CONCLUSION

Accordingly, for the reasons articulated above, Defendant's Motions to Suppress [#40] is GRANTED.

Defendant's Motion to Suppress Statements [#41] is GRANTED.

The period of delay resulting from Defendant's pretrial motions is excluded from the Speedy Trial Clock, May 20, 2022 through October 18, 2022. *See* 18 U.S.C. § 3161(h)(1)(D). The Court also finds that the ends of justice served by granting a continuance outweigh the interest of Defendant and the public in a speedy trial. *See* 18 U.S.C. § 3161(h)(7)(A). Thus, the Court hereby grants a continuance excluding October 18, 2022 through November 15, 2022 from the Speedy Trial Clock. Now that the Defendant's Motions are resolved, counsel will require time to prepare for trial. As such, without a continuance and necessary time to prepare, a miscarriage of justice will likely occur and/or deny the parties the reasonable time necessary for effective preparation, taking into consideration the exercise of due diligence. *See* 18 U.S.C. § 3161(h)(7)(B)(i) and (iv).

| **YOU WILL RECEIVE NO FURTHER NOTICE OF THESE DATES** | |
|---|---|
| Status Conference: | November 15, 2022 at 10:00 a.m. |
| Witness Lists, Proposed Voir Dire, Proposed Jury Instructions and | January 24, 2023 |

| | |
|---|---|
| Proposed Verdict Form (submitted directly to Judge Drain's chambers) due: | |
| Plea cutoff hearing/final pretrial conference: | January 13, 2023 at 2:00 p.m. |
| Signed Rule 11 Plea Agreement: | January 11, 2023 |
| Motions *in Limine* due: | January 13, 2023 |
| Trial: | January 31, 2023 at 9:00 a.m. |

SO ORDERED.

Dated: October 18, 2022                              /s/Gershwin A. Drain
                                                                    GERSHWIN A. DRAIN
                                                                    United States District Judge

CERTIFICATE OF SERVICE
Copies of this Order were served upon attorneys of record on
October 18, 2022, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager

19